# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Crim. No. 19-211 (JRT/BRT) |
| Plaintiff, | |
| v. | |
| Buster Travoire Gaston (1), | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Allen A. Slaughter, Jr., Esq., Lauren Olivia Roso, Esq., United States Attorney's Office, counsel for Plaintiff.

Rory Patrick Durkin, Esq., Giancola-Durkin, PA, counsel for Defendant Gaston.

BECKY R. THORSON, United States Magistrate Judge.

Defendant Buster Travoire Gaston has been indicted for possession with intent to distribute and conspiring to distribute methamphetamine, PCP, cocaine, heroin, and marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846 and 18 U.S.C. § 2. (Doc. No. 52, Superseding Indictment.) Gaston moves to suppress the physical evidence seized from the rental vehicle he was traveling in, after a stop and search of the vehicle on June 12, 2019. (Doc. No. 127, Def.'s Mot. to Suppress.) He asserts "there was no lawful basis to stop the vehicle," law enforcement "unlawfully and/or unreasonably extended the scope of the initial stop," "the driver did not consent to the search of the vehicle," and "any consent on the part of the Defendant was coerced and involuntary." (*Id.*)

An evidentiary hearing was held on October 16, 2020, during which the Court received seven hearing exhibits, and Agent Mark Altendorfer, Minnesota State Trooper Patric Ignazewski, and Minnesota State Trooper Anthony Mains testified. (Doc. Nos. 142, 143.) The Court requested post-hearing briefs on the motion, which were filed on December 12, 2020, and January 6, 2021. (Doc. Nos. 155, 158.) Based on the evidence presented at the hearing, and for the reasons stated below, this Court recommends that Gaston's motion to suppress be denied.

## BACKGROUND

On June 10, 2019, law enforcement received an anonymous tip from Crime Stoppers of Minnesota[1] reporting the following: "Travoire [G]aston is traveling by rental car to [V]egas and then California to pick up and transport weight in cocaine weed and edibles back to [M]innesota. He has stopped in Arizona right now on his way. He has [T]eresa [M]arie [L]indskog traveling and transporting the drugs with him in a rental car[.]" (Doc. No. 143, Hr'g Ex. 1.) The tip included detailed information about Gaston's height, weight, hair color, eye color, age, birth date, tattoo, address, and phone number. (*Id.*) The tip stated that Gaston has guns and was a "high ranking crip." (*Id.*) It also stated that "he just posted a pic of him[self] stopping to see other crip members in [A]rizona on his facebook page that is public." (*Id.*) The tip also provided various detailed identifying information about Teresa Lindskog, including that she has a chipped front tooth. (*Id.*) The

---

[1]  Crime Stoppers of Minnesota is "a nonprofit organization whose goal is to provide information from anonymous people or tipsters to law enforcement providing a conduit that they can provide their information without being identified." (Doc. No. 154, 10/16/20 Redacted Hr'g Tr. ("Tr.") 18.)

2

tipster reported that Gaston sells "Cocaine, weed, Meth, heroine, edibles, [and] crack," and "[t]hey travel with multiple people to [V]egas and California multiple times a month and have multiple rental cars to transport everything back to Minnesota for distribution." (*Id.*)

Agent Mark Altendorfer, who works for the Ramsey County Sheriff's Office and is a member of the Ramsey County Violent Crime Enforcement Team ("VCET"), testified that he learned of the Crime Stoppers tip the following morning, on June 11, 2019. (Tr. 13, 20.) That day, he and his VCET team began to verify pieces of the tip "using as many independent sources as is feasible." (Tr. 31.) They first reached out through the Crime Stoppers communication system to connect with the tipster, but the tipster did not respond. (Tr. 32.) Using law enforcement and Department of Vehicle Services databases, the VCET agents were able to confirm that the names, dates of birth, and general descriptions for Gaston and Lindskog were mostly accurate. (Tr. 32–35.) The only discrepancy was Lindskog's birthday, which was off by one year. (Tr. 34.) And they were able to corroborate that Lindskog indeed did have a chipped front tooth through her driver's license photo. (Tr. 35.) The agents corroborated that Gaston was a felon, as was reported by the tipster, and that his criminal history was "extensive" and included a prior federal conviction for trafficking cocaine. (Tr. 36.) They also learned that the phone number provided by the tipster for Gaston was registered to a person with the same last

name.[2] (Tr. 37–38.) In addition, the agents located a Facebook social media account under the name "Traviore Gaston," and on Gaston's Facebook page was a photo of Gaston with friends that was posted on June 10, 2019, with a statement saying "did a drive-by on the homies in Arizona," corroborating the tipster's statement that Defendant had posted the photo and was traveling through Arizona. (Tr. 38, 42; *see also* Hr'g Ex. 2.)

Based on the tipster's report and the corroborated information, Agent Altendorfer applied for and received a GPS search warrant to track location data for the cell phone number that the tipster indicated was Gaston's.[3] (Tr. 43–44.) The VCET team began to receive location data on the phone around 8:00 p.m. on June 11, 2019, and they tracked the phone as it traveled eastbound through Colorado that evening, stopping around 11:00 p.m. in northeastern Colorado. (Tr. 44–46.) The next morning, on June 12, 2019, the agents continued to track the phone as it traveled eastbound into Nebraska, and then north through Iowa. (Tr. 47–51; *see also* Hr'g Ex. 4.) Agent Altendorfer testified that as they watched the location of the phone move closer to Minnesota, the location tracking corroborated the tipster's report that Defendant would be returning to Minnesota. (Tr. 49.) Also on the morning of June 12, 2019, the VCET team learned that Gaston had

---

[2]   Agent Altendorfer testified that it is common for drug traffickers to register phones under alias or names like their own to avoid detection by law enforcement. (Tr. 37–38.) Because the phone number here was registered to someone with the same last name as the suspect provided in the tip—Gaston—Agent Altendorfer found the tip more credible. (Tr. 37.)

[3]   Defendant Gaston does not challenge the validity of this search warrant.

4

rented a 2019 Toyota Camry from Avis Budget Group in the Las Vegas area and that the vehicle was due to be returned in the Twin Cities (Minnesota) on June 13, 2019, which also was consistent with the tipster's report. (Tr. 49; *see also* Hr'g Ex. 3.)

Once the agents determined, based on the tracking data, that Gaston and Lindskog would likely be entering Minnesota from Iowa via I-35, Agent Altendorfer had a meeting with his team, and he and thirteen other investigators began to station themselves on the I-35 corridor. (Tr. 51–52.) Agent Altendorfer testified that their goal was to stop the suspect vehicle, search the vehicle for narcotics, and prevent any narcotics found in the suspect vehicle from entering the Twin Cities metro area. (Tr. 53–54.) Agent Altendorfer's team requested Minnesota State Patrol's assistance in stopping the suspect vehicle, with a goal—"if possible"—for the State Patrol officers to develop their own independent probable cause for the stop. (Tr. 53 (identifying this investigative tool as a "whisper" or "wall-off" stop).) Even so, Agent Altendorfer testified that by this time he believed the tipster's report that Gaston was trafficking a "myriad" of drugs to the Twin Cities area was accurate. (Tr. 54.)

Soon after the black 2019 Toyota Camry crossed into Minnesota from Iowa on I-35, VCET Investigator Fritze from the Maplewood Police Department identified the vehicle and followed it as the vehicle stopped at a truck stop. (Tr. 55.) At that time, two additional officers observed two people exit the vehicle; the officers identified them as Mr. Gaston and Ms. Lindskog and confirmed the description for Gaston provided by the tip was accurate. (Tr. 55–56.) Gaston and Lindskog were then observed returning to the vehicle, with Lindskog enter the driver's seat. (Tr. 56.) The investigators at that time

5

knew that Lindskog had a revoked driver's license. (*Id.*) As the Camry continued northbound on I-35, Investigator Fritze observed Lindskog make a lane change without signaling that cut off another motorist, and Fritze radioed this information to others, which was forwarded to the Minnesota State Troopers. (Tr. 57.)

One of those Minnesota State Troopers was Patric Ignaszewski, a K-9 road officer who was working with K-9 Jery on June 12, 2019, in Steele County, Minnesota, and who was requested by Agent Altendorfer to assist in performing a traffic stop on a vehicle that they believed was involved in narcotics trafficking. (Tr. 90, 95–96.) After receiving the radioed information that the vehicle had committed an illegal lane change, and after identifying the suspect Camry on the road, Trooper Ignaszewski initiated a stop on the vehicle. (Tr. 99–100; *see also* Hr'g Ex. 5, Trooper Ignaszewski's squad car dash camera video.) Trooper Ignaszewski approached the vehicle on the passenger side; he testified that he smelled a strong odor of air freshener as he approached, which he says could have been used to mask some other smell. (Tr. 103–05.)

Trooper Ignaszewski learned from the passengers that the vehicle was a rental and that they were driving to Minnesota from Las Vegas. (Tr. 106.) He also observed a package of trash bags in the backseat, which he thought was odd for a one-way rental vehicle. (*Id.*) He took the rental car documents, Gaston's and Lindskog's licenses, and returned to his squad car where he learned that Lindskog's license was suspended. (Tr. 109–10.) At that point, another officer brought Lindskog to the squad car to discuss her suspended license. (Tr. 110.) Lindskog then told the officers more information about the trip; she stated that she and Defendant flew to Los Angeles, where they visited a wax

6

museum and saw the Hollywood sign, and then they drove to Arizona to visit Mr. Gaston's friends, and thereafter drove to Las Vegas. (Tr. 112.) She stated that they were not in a hurry to return home, which is why they rented another vehicle for the return trip.[4] (*Id.*) Trooper Ignaszewski then walked back to the Camry and returned the rental documents and license to Gaston. (Tr. 115.) He asked Gaston some clarifying questions about his trip. (*Id.*) Gaston responded stating that he and Lindskog flew to Los Angeles, drove to Arizona to spend time with friends, continued to Las Vegas where they visited a wax museum, and that they were in a hurry to return to Minnesota because Lindskog had an event that evening. (Tr. 115–16.) Trooper Ignaszewski testified that both Lindskog and Gaston were visibly nervous when he spoke to them, more so than he typically observed from the general motoring public. (Tr. 114–16; *see also* Tr. 142–43.) He also testified that California, Arizona, and Las Vegas were all common areas for narcotic trafficking to be based out of. (Tr. 116.) In addition, he testified that from what he had learned and observed about Lindskog, Gaston, and their trip, caused him to believe that they were involved in some form of criminal activity. (Tr. 116–17.)

Trooper Ignaszewski asked Gaston if there was anything illegal in the vehicle, and Gaston replied that there was not. (Tr. 119.) Trooper Ignaszewski then asked for consent twice to search the vehicle, to which Gaston said yes and Lindskog said no.[5] (Tr. 120–

---

[4] From the rental car paperwork, Trooper Ignaszewski learned the rental fee for the Camry was approximately $1600, which he noted was much more expensive than one-way flights between Las Vegas and Minnesota. (Tr. 113–14.)

[5] Specifically, Gaston said, "Yes, you can. I don't know why you need to, though." (Hr'g Ex. 5 at 20:25-21:00; Tr. 120.)

7

21.) At that point, Trooper Ignaszewski had his K-9 partner Jery perform a sniff of the exterior of the rental vehicle. (Tr. 121.) Trooper Ignaszewski explained that during the exterior search, he observed Jery "alert" to the odor of narcotics, which meant that he encountered a narcotics odor that he was trained to detect. (Tr. 125–26; 127–28.) Trooper Ignaszewski stated that Jery alerted on the rear wheel well of the passenger side of the vehicle, the open front passenger window, the open front driver's window, and the driver's side door seams and rear wheel well. (Tr. 128.) Trooper Ignaszewski opened the driver's side door and Jery entered the vehicle where he then alerted in the backseat before giving a "final indication" on a narcotics source along the seam between the bottom and backrest of the rear seat. (Tr. 128–29.) Thereafter, the troopers searched the Camry and found methamphetamine, heroin, PCP, marijuana, marijuana edibles, and cocaine in the vehicle's trunk. (Tr. 129–30.)

## ANALYSIS

Gaston argues in his post-hearing brief that the narcotics found in the rental vehicle should be suppressed on three grounds: "(1) law enforcement had no lawful basis to stop the vehicle he had rented and was traveling in; (2) law enforcement unlawfully extended the scope of the initial vehicle stop; and (3) there was no lawful basis to search the vehicle the Defendant had rented and was traveling in." (Doc. No. 155, Def.'s Mem. of Law 2.) Regarding the stop of the vehicle, Defendant argues that the stop and questioning of Gaston and Lindskog were not related to the asserted lane-change violation or any other traffic violation but instead were directed at uncovering narcotics and justifying a search of the Camry when law enforcement otherwise lacked probable

cause to do so. Defendant argues that the information provided by the tipster was not enough to provide the basis for an automobile stop and that the lane-change violation assertion is not believable. Defendant further argues that even if the stop was allowed as an investigatory traffic stop, the officers illegally expanded the scope of the traffic stop for the lane-change violation by asking questions on topics unrelated to the lane change and by prolonging the stop beyond the time reasonably required to address the traffic violation. Defendant also challenges the K-9 search of the vehicle asserting that rather than making an entry into the suspect vehicle on its own initiative, Trooper Ignaszewski led his canine into the vehicle. (*Id.* at 17–35.)

The Government contends that both the stop and warrantless search of the vehicle were supported by probable cause. The Government argues that although the traffic violation provided a valid reason for the stop, law enforcement already had probable cause to stop and search the vehicle based on the information supplied by the tipster along with information learned on June 11 and 12, 2019, as the vehicle traveled toward Minnesota. The Government also argues that the totality of the circumstances, including the traffic violation, suspicious travel history, and inconsistent stories provided further probable cause for the stop and search. In addition, the Government asserts the K-9 search was a proper extension of the stop. (Doc. No. 158, Gov't's Post-Hr'g Resp. 16–27.)

The Fourth Amendment protects persons against "unreasonable searches and seizures," and typically requires a warrant based on probable cause. U.S. Const. amend. IV. Searches and seizures conducted without a warrant are *per se* unreasonable unless

they fall within an "established and well-delineated exception[]" to the Fourth Amendment's warrant requirement. *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quotation omitted). "Under the Fourth Amendment, a traffic stop is reasonable if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred." *United States v. Walker*, 840 F.3d 477, 483 (8th Cir. 2016). Under the automobile exception, the police may search and seize a vehicle without a warrant if they have probable cause to believe that contraband or evidence of a crime will be found inside. *See California v. Acevedo*, 500 U.S. 565, 579–80 (1991); *United States v. Vore*, 743 F.3d 1175, 1179 (8th Cir. 2014); *United States v. Sims*, 424 F.3d 691, 693 (8th Cir. 2005); *see United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993) (stating that officers can stop and search a vehicle without a warrant if they have probable cause to believe that the people in the vehicle are transporting drugs).

Because the subjective motives and intentions of officers have no place in Fourth Amendment analysis, which asks only whether the officers' actions were objectively reasonable, the validity of an automobile search does not depend on whether "the ostensible ground for the search was different and improper" and the existence of probable cause does not hinge "on what the particular officers involved believed but on what a reasonable officer in their position would have believed." *United States v. Cervantes*, 19 F.3d 1151, 1153–54 (7th Cir. 1994); *see also Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006) (explaining that subjective motives and intent are "irrelevant" because "[a]n action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively*,

10

justify the action") (quotations and brackets omitted) (emphasis in original); *McClendon v. Story Cnty. Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005) ("[A]n officer's subjective intent is never relevant under a Fourth Amendment analysis, so long as an objective basis for the [challenged action] exists."). Probable cause exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Vore*, 743 F.3d at 1179. Whether officers have probable cause to stop a vehicle is determined by the totality of the circumstances. *United States v. Brown*, 49 F.3d 1346, 1349–50 (8th Cir. 1995).

Here, before Gaston's rental vehicle was stopped on the interstate, law enforcement had probable cause to believe that narcotics or other evidence of a drug-trafficking crime would be found in the vehicle, thus justifying the stop and warrantless search of the car under the automobile exception. Where, as here, "probable cause depends on information supplied by an informant, the core question is whether the information is reliable." *United States v. Dukes*, 758 F.3d 932, 937 (8th Cir. 2014) (quotation and alterations omitted). Such information may be sufficiently reliable to establish probable cause where the informant has a "track record of providing accurate information," where his information is "at least partly corroborated" by the police, *or* where he has accurately predicted certain events. *United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013). Where, as here, "a previously unknown informant provides information, the informant's lack of a track record requires 'some independent verification' to establish the reliability of the information." *United States v. Amaya*, 52 F.3d 172, 174 (8th Cir. 1995) (quoting *Brown*, 49 F.3d at 1349). "This confirmation can

11

consist of verifying details that would not, standing alone, lead police to suspect a crime." *United States v. Taylor*, 106 F.3d 801, 803 (8th Cir. 1997) (citing *United States v. Wilson*, 964 F.2d 807, 809–10 (8th Cir. 1992)). An informant can also "prove himself to be a reliable source for law enforcement by providing predictive information about a meeting time or place." *United States v. Harry*, 930 F.3d 1000, 1006 (8th Cir. 2019).

This Court finds that the information provided by the anonymous Crime Stoppers tipster supports the finding of probable cause. Several pieces of information in the Crime Stoppers tip were corroborated by investigators, including Gaston's physical description, date of birth, contact information (which included a phone number registered to a person with the same last name as Gaston), home address, that he has a criminal history as a felon for drug trafficking, and that he has a history of using rental vehicles. They also corroborated Lindskog's physical description, including that she did have a chipped front tooth as was reported by the tipster. In addition, the tipster correctly predicted Gaston's travel itinerary, as was corroborated through Gaston's Facebook page photo of Gaston with friends in Arizona that was posted on June 10, 2019 (which is consistent with what the tipster reported), and further corroborated through the rental car documents showing a vehicle was rented by Gaston and was to be returned in Minnesota on June 13, 2019, and the GPS location information showing Gaston was traveling from the southwest states toward Minnesota on June 11 and 12, 2019 (showing the tipster correctly predicted that Gaston would be traveling back to Minnesota in a rental vehicle during that time period). Because most of what the tipster provided in the tip was corroborated by law

enforcement,[6] this Court concludes the information provided by the tipster was reliable, including the report that Gaston was transporting drugs with him in a rental vehicle on his way back to Minnesota. *See Brown*, 49 F.3d at 1349 (stating that information "proved correct in certain aspects of his prediction (the innocent behavior) increases the probability that other aspects of his prediction (the criminal behavior) are also correct"); *see also Illinois v. Gates*, 462 U.S. 213, 245 (1983) ("If the informant had access to accurate [innocent] information[,] a magistrate could properly conclude that it was not unlikely that he also had access to reliable information of . . . alleged illegal activities."); *United States v. Morales*, 923 F.2d 621, 625 (8th Cir. 1991) (finding corroboration of "innocent" details sufficient to corroborate description of illicit activity). Therefore, regardless of the motives of this tipster, the facts provided and the additional information obtained through the GPS warrant and the rental car company established probable cause to stop the vehicle Gaston was traveling in and search for narcotics or other evidence of drug trafficking.[7] *See Taylor*, 106 F.3d at 803 (finding unknown informant's report

---

[6]  As explained above, the only discrepancies were that the date provided for Lindskog's birthday was off by one year and the phone number provided for Gaston was registered to a person with the last name Gaston, but a different first name. These slight discrepancies do not alter the Court's probable cause determination considering the other information the officers learned corroborating the tipster's report. *See Amaya*, 52 F.3d at 175 ("The slight discrepancies in the information provided by the various police informants are inconsequential in the light of the totality of the circumstances on the record before us.").

[7]  For similar reasons, this Court would conclude that the stop was objectively justified based on reasonable suspicion that the vehicle was involved in drug trafficking. *See United States v. Farnell*, 701 F.3d 256, 261 (8th Cir. 2012) (explaining that an investigatory stop of a vehicle may be based on "reasonable suspicion . . . that criminal

(Footnote Continued on Next Page)

reliable when the informant provided a correct address, phone number, vehicle, and first name, as well as a location that the defendant would arrive at on a certain date); *see also Brown*, 49 F.3d at 1349 (holding that an informant's information is sufficient to establish probable cause where the informant accurately predicts the time and place of certain events, even if those events are themselves innocent).[8]

---

activity is afoot," not only for a traffic violation). Trooper Ignaszewski's testimony that he stopped the vehicle for having participated in an illegal lane-change does not change that conclusion, as "the constitutional reasonableness of a traffic stop does not depend on the actual motivations . . . [or] subjective intentions of the officer making the stop." *United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1109 (8th Cir. 2007).

[8]   Because the stop and search of the rental vehicle was objectively justified under the automobile exception, this Court need not decide whether they were also justified for the other reasons argued by the Government. With that said, this Court notes that even if the anonymous tip had not provided enough corroborated information to support probable cause (which this Court finds that it did), this Court concludes that the traffic stop was otherwise supported by probable cause based on the reported traffic violation. Probable cause to conduct a traffic stop exists "as long as an officer objectively has a reasonable basis for believing that the driver has breached a traffic law." *United States v. Gordon*, 741 F.3d 872, 876 (8th Cir. 2013) (quotations omitted). Trooper Ignaszewski had probable cause to stop the vehicle because he had just received a report from a fellow law enforcement officer stating that he had observed the vehicle change lanes without signaling, which is a traffic violation under Minnesota law. *See* Minn. Stat. § 169.19. Defendant contends Trooper Ignaszewski could not have had probable cause to make the stop based on the traffic violation because he did not observe the traffic violation himself. However, "[t]he collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers." *United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008) (citing *United States v. Williams*, 429 F.3d 767, 771–72 (8th Cir. 2005) (finding collective knowledge doctrine sufficient to impute knowledge of other officers on team to an officer who received a radio request from the team to stop the vehicle)). Both Agent Altendorfer and Trooper Ignaszewski testified to hearing Investigator Fritze air the traffic violation over the radio. (Tr. 57, 100.) This Court finds that report credible, as no other evidence in the record shows that the lane-change violation did not happen or that the report of the traffic violation was not communicated to Trooper Ignaszewski.

(Footnote Continued on Next Page)

The stop and search of Gaston's rental vehicle was justified under the automobile exception to the Fourth Amendment's warrant requirement. Thus, the narcotics that were

---

Further, the subjective intent of the officers did not matter. "It does not matter if their true intent was to stop the car to see if it was carrying drugs." *United States v. Stapleton*, 10 F.3d 582, 583–84 (8th Cir. 1993) (stating further that "it is immaterial that the patrolmen had to pursue the car in order to catch Golston in violation of the law and that the officers ordinarily may not have stopped a car [for that violation]"); *see also United States v. Arreola*, No. 19-10 (DWF/BRT), 2019 WL 3292072, at *6 n.10 (D. Minn. Apr. 15, 2019) ("It also does not matter if, as appears to be the case, the traffic stop was 'a pretext for other investigation.'" (citing *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002)). Once Lindskog committed the traffic violation, there was probable cause to stop the car. *See United States v. Cummins*, 920 F.2d 498, 500–01 (8th Cir. 1990).

And even if there was no probable cause to stop the vehicle until the traffic violation occurred, this Court finds there was no Fourth Amendment violation when law enforcement searched the vehicle. First, the record reflects that Gaston—the person who rented the vehicle (*see* Hr'g Ex. 3 at 6)—voluntarily gave consent to search the vehicle. "Because the [officers] had consent, no probable cause to search was necessary." *Stapleton*, 10 F.3d at 584 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)); *see also United States v. Coney*, 456 F.3d 850, 860 (8th Cir. 2006) (finding that the adult passenger who was listed as the driver on the rental agreement for the vehicle—where there was no evidence he was under the influence of drugs or alcohol or that the officer used intimidation or threats to evoke consent—voluntarily consented to a search). Second, after learning that Lindskog was driving with a suspended license, hearing conflicting accounts of Gaston and Lindskog's travels, learning that the rental vehicle was a one-way rental that cost approximately $1600, smelling a strong odor of air freshener, and observing Gaston and Lindskog's abnormal nervousness, the Trooper had good reason to extend the stop to allow for the K-9 search of the exterior of the vehicle. *See United States v. Donnelly*, 475 F.3d 946, 952 (8th Cir. 2007) (holding that a K-9 drug sniff search was constitutional where the officer had reasonable suspicion of criminal activity); *Linkous*, 285 F.3d at 720 (stating that courts look to the "totality of circumstances, in light of the officer's experience" in determining whether an officer has reasonable suspicion to expand the scope of a traffic stop). And third, the K-9 alerted multiple times on the exterior of the vehicle to the possible presence of narcotics. This provided independent probable cause to search the interior of the vehicle.

15

found and seized from the vehicle on July 12, 2019, are not subject to suppression under the Fourth Amendment.[9]

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress (Doc. No. 127) be **DENIED**.


Date: February 5, 2021

<i>s/ Becky R. Thorson</i><br>
BECKY R. THORSON<br>
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **February 19, 2021**. A party may respond to those objections within **fourteen days** after service thereof. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.

---

[9] Because this Court finds that the automobile exception applies, the Defendant's argument regarding the K-9 search fails. "[I]t is uncontroversial that if police had probable cause to search the car before the dog entered the interior, then any search effected by the entry was permissible. No warrant is required to search a car with probable cause." *United States v. Pulido-Ayala*, 892 F.3d 315, 319 (8th Cir. 2018).