UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 19-cr-211 (JRT/BRT) |
| v. | ORDER ADOPTING REPORT AND RECOMMENDATION |
| BUSTER TRAVOIRE GASTON, | |
| Defendant. | |

Allen A. Slaughter, Jr. and Lauren Olivia Roso, **UNITED STATES ATTORNEY'S OFFICE,** 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for plaintiff.

Rory Patrick Durkin, **GIANCOLA-DURKIN PA**, 403 Jackson Street, Suite 305, Anoka, MN 55303, for defendant.

Defendant Buster Travoire Gaston filed a Motion to Suppress evidence obtained as a result of a stop and search of his rental vehicle. After an evidentiary hearing and additional briefing from the parties, Magistrate Judge Becky Thorson issued a Report and Recommendation ("R&R"), recommending that Gaston's motion be denied. Gaston objects to this recommendation. The Court finds that officers had sufficient probable cause to stop Gaston's rental vehicle. Further, Gaston consented to a search of the vehicle, the officer who conducted the stop had reasonable suspicion to extend the scope of the stop, and the K-9 sniff around the exterior of the vehicle provided independent

probable cause for the search. The Court will overrule Gaston's objections, adopt the R&R, and deny the Motion to Suppress.

## BACKGROUND

**I.   FACTS**

On June 10, 2019, law enforcement received an anonymous tip from Crime Stoppers of Minnesota, a nonprofit organization that is a conduit for anonymous tipsters to provide information to law enforcement. (Hr'g Tr. at 17:2–6; 18:2–15, Oct. 16, 2020, Docket No. 154.) The tip stated that "Traviore [sic] [G]aston is traveling by rental car to [V]egas and then California to pick up and transport weight in cocaine weed and edibles back to [M]innesota. He has stopped in Arizona right now on his way. He has [T]eresa [M]arie [L]indskog traveling and transporting the drugs with him in a rental car[.]" (Hr'g Ex. 1 at 1, Apr. 21, 2020, Docket No. 84.)

The tip provided detailed personal information about Gaston including his height, weight, hair color, eye color, facial hair, age, birth date, tattoo, address, phone number, and information about the ownership of his residence. (*Id.*) It also stated that Gaston had recently posted a photo of himself with "other crip members in [A]rizona" on his public Facebook page. (*Id.*) The tipster stated that Gaston had guns, that he was a "high ranking crip" and that he had previous felony convictions. (*Id.*) The tip provided detailed identifying information on Teresa Lindskog as well, including her height, weight, eye color, birth date, and that she has a chipped front tooth. (*Id.* at 2.)

The tipster also reported that the suspect[s] sell "[c]ocaine, weed, [m]eth, heroine, edibles, [and] crack," and "[t]hey travel with multiple people to [V]egas and California multiple times a month and have multiple rental cars to transport everything back to Minnesota for distribution." (*Id.*)

The tip was sent to Agent Mark Altendorfer, a member of the Ramsey County Violent Crime Enforcement Team ("VCET") that following morning, June 11, 2019. (Hr'g Tr. at 14:25–15:11; 20:19–21.) Unable to contact the anonymous tipster, Agent Altendorfer proceeded to verify every piece of the tip using "as many independent sources as [was] feasible." (*Id*. at 31:15–16.) Agent Altendorfer and the VCET team, using information from the Department of Vehicle Services and Department of Corrections, were able to confirm that the names, dates of birth, and general physical descriptions for Gaston and Lindskog provided in the tip were mostly accurate. (*Id*. at 33:21–34:13.) The date of birth the tipster gave for Lindskog was the correct date but the incorrect year. (*Id*. at 34:12–13, 34:23–24.) The agents were able to corroborate that Gaston had been convicted of prior felonies, including a prior federal conviction for trafficking cocaine. (*Id*. at 36:11–20.) The phone number provided by the tip was registered to a person with the same last name as Gaston. (*Id*. at 37:14–21.) Agents located a Facebook account for Gaston, and on that page Gaston had posted a photo of himself with a group of men on June 10, 2019 with the caption "did a drive-by on the homies in Arizona," again consistent with the information in the tip. (*Id*. 38:9–12, 42:9–10; Ex. List, Hr'g Ex. 2, Oct. 16, 2020

Docket No. 143.) The agents were also able to corroborate that Lindskog had a chipped front tooth through her driver's license photo. (Hr'g Tr. at 35:3–4.)

Based on the corroborated tip, Agent Altendorfer applied for and was granted a GPS search warrant to track location data for the cell phone number provided in the tip and associated with Gaston. (*Id*. at 43:21–44:3.) The VCET team began tracking the location of the phone on the evening of June 11, 2019. (*Id*. at 44:10–11, 45:7–10.) The next morning, on June 12, 2019, the phone began traveling eastbound from Colorado towards Nebraska, then Iowa, in the general direction of Minnesota. (*Id*. at 47:16–22; Ex. List, Hr'g Ex. 4, Oct. 16, 2020 Docket No. 143.) Agent Altendorfer testified that, at this point, the movement of the phone further corroborated the tipster's report that Gaston was returning to Minnesota. (Hr'g Tr. at 47:1–9.) VCET also confirmed that Gaston had rented a 2019 Toyota Camry from Avis Budget Group in Las Vegas that was due to be returned in the Twin Cities on June 13, 2019, as the tipster had indicated. (*Id*. at 48:25–49:17, Ex. List, Hr'g Ex. 3, Oct. 16, 2020 Docket No. 143.)

VCET stationed vehicles along the Interstate-35 ("I-35") corridor intending to stop the suspect vehicle, search the vehicle for narcotics, and prevent any narcotics found in the vehicle from entering the Twin Cities metro area. (Hr'g Tr. at 52:4–22; 53:21–54:4.) VCET requested Minnesota State Patrol's assistance in stopping the suspect vehicle using a "whisper" or "wall-off" stop. (*Id*. at 52:25–53:2.) This investigative tool allows officers to find independent probable cause to make a stop. (*Id*. at 53:4–6; 53:14–17.) Whisper

-4-

stops are often used when officers have investigative information that they do not wish to reveal to a suspect. (*Id*. at 53:10–13.) Agent Altendorfer testified that, regardless of whether the Minnesota State Patrol generated independent probable cause, his "investigative goal [was] to search that vehicle for the suspected narcotics." (*Id*. at 53:18–22.) Agent Altendorfer further testified that he believed at that point that Gaston was trafficking drugs because VCET was able to verify the majority of the information in the tip. (*See id*. at 54:5–22.)

Investigator Fritze of the Maplewood Police Department identified the 2019 Toyota Camry soon after it crossed into Minnesota from Iowa along I-35. (*Id*. at 55:1–6.) The vehicle pulled into a truck stop where officers identified Gaston and Lindskog as the passengers of the vehicle and were able to confirm that the tipster's description of Gaston was accurate. (*Id*. at 55:11–56:7.) When the two returned to the vehicle after eating at the truck stop, Lindskog entered the driver's seat. (*Id*. at 56:11–13.) The investigators knew that Lindskog had a revoked driver's license. (*Id*. at 57:4–12.) Investigator Fritze began following the vehicle as it continued northbound on I-35 and observed Lindskog make a lane change without signaling, cutting off another motorist. (*Id*. at 57:14–18.) Investigator Fritze radioed this information to other law enforcement, including Agent Altendorfer and the Minnesota State Patrol. (*Id*. at 57:20–23.)

State Trooper Patric Ignaszewski, a K-9 road officer working with his K-9 partner Jery on June 12, 2019, had been called in to assist in performing a traffic stop of Gaston's

vehicle. (*Id.* at 90:15–17; 95:23–24; 96:14–19.) Agent Altendorfer informed Trooper Ignaszewski that they would be performing a drug interdiction, and provided details on the vehicle, the occupants, a timeline for their travels, and updates on their location. (*Id.* at 99:9–12.) Trooper Ignaszewski was also in communication with Ramsey County VCET members who were performing surveillance on the Camry. (*Id.* at 99:24–100:5.) Trooper Ignaszewski received Investigator Fritze's radio communication that the Toyota had made an illegal lane change; Trooper Ignaszewski then identified the vehicle on the road and initiated a traffic stop. (*Id*. at 99:16–19; 100:1–5; Ex. List, Hr'g Ex. 5, Oct. 16, 2020 Docket No. 143.) Soon after Trooper Ignaszewski initiated the stop, Trooper Mains arrived on the scene to provide assistance. (Hr'g Tr. at 140:13–15; 141:2–3.) Trooper Ignaszewski approached the passenger side of the vehicle and smelled a strong odor of air freshener, which Trooper Ignaszewski testified was something he had experienced in previous drug interdiction events. (*Id*. at 103:15–17; 105:5–16.)

Trooper Ignaszewski learned from Gaston and Lindskog that the vehicle was a rental and that they were travelling from Las Vegas to Minnesota. (*Id*. at 108: 16–21.) He reviewed the rental car documents and Gaston and Lindskog's licenses and confirmed that Lindskog's license had been suspended and that the rental car cost $1600; Trooper Ignaszewski testified that he knew this to be far more expensive than a one-way plane ticket from Las Vegas to Minneapolis. (*Id*. at 109:20–110:6; 113:12–13; 114:9–13.) Lindskog was brought to the squad car where she answered questions about her

suspended license and provided more information regarding their trip. (*Id*. at 110:8–12; 111:3–10.) Lindskog told Trooper Ignaszewski that she and Gaston had flown to Los Angeles, where they visited a wax museum and saw the Hollywood sign, then drove to Arizona to visit Gaston's friends, and finally drove to Las Vegas where they rented the Camry to drive back to Minneapolis. (*Id*. at 112:6–18; 113:10–13.) She stated that they were not in a hurry to get home. (*Id*. at 112:15–18.)

Trooper Ignaszewski then approached the Camry and asked Gaston a few clarifying questions regarding their trip. (*Id*. at 115:8–15.) Trooper Ignaszewski noted that Gaston's story was inconsistent with Lindskog's because he stated that they visited a wax museum in Las Vegas and that they were in a hurry to return to Minnesota because Lindskog had a birthday event to attend that evening. (*Id*. at 116:2–6; 117:8–11.) Troopers Ignaszewski and Mains testified that Gaston and Lindskog were more nervous during the interaction than the general motoring public. (*Id*. at 114:18–21; 115:4–6; 116:7–12.) Trooper Ignaszewski testified that he observed numerous indications of criminal activity during the stop, including the one-way flight to a source area of illegal narcotics, the one-way car rental, the significant cost of the rental vehicle, the contents of the vehicle, the oversharing by Lindskog, the inconsistencies in their stories, and the odor from the car. (*Id*. at 116:16–117:18; 118:3–5.)

At this point in the stop, Trooper Ignaszewski asked if there was anything illegal in the vehicle and Gaston replied that there was not. (*Id*. at 119:22–24.) Trooper

Ignaszewski then asked twice for Gaston's consent to search the vehicle, and Gaston replied, "Yes, you can." (*Id*. at 119:24–120:14; Hr'g Ex. 5.) Though it is not clearly audible from the surveillance video, Trooper Ignaszewski testified that when offering his consent, Gaston also said something to the effect of "I don't know why you need to, though." (Hr'g Tr. at 120:13–14.) Lindskog did not give her consent to search the vehicle. (*Id.* at 120:24–121:2.)

Trooper Ignaszewski then performed a sniff search with his K-9 Jery around the exterior of the vehicle. (*Id*. 121:4–5.) K-9 Jery alerted[1] several times around the exterior of the vehicle, communicating to Trooper Ignaszewski that he detected narcotics odor. (*Id*. at 127:23–128:13.) K-9 Jery alerted to several areas around the car, at one point placing his head into the open driver's front window. (*Id*. at 128:1–19.) Trooper Ignaszewski then opened the driver's side door and K-9 Jery entered the vehicle where he gave his "final indication" along the seam between the bottom and backrest of the rear seat. (*Id*. at 128:23–129:3.) Troopers Ignaszewski and Mains then searched the Camry and found methamphetamine, heroin, PCP, marijuana, marijuana edibles, and cocaine in the vehicle's trunk. (*Id*. at 131:7–21.)

---

[1] An alert is the initial change in the K-9 when it first is in the presence of narcotics odor, whereas an indication is when the K-9 pinpoints the exact source of the narcotics odor. (Hr'g Tr. at 126:13–20.)

## II.  PROCEDURAL HISTORY

Gaston was indicted for possession with intent to distribute and conspiring to distribute methamphetamine, PCP, cocaine, heroin, and marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, and 18 U.S.C. § 2.  (2nd Superseding Indictment at 1–2, Mar. 25, 2021, Docket No. 173.)[2]  Gaston moved to suppress the evidence obtained in the June 12, 2019 vehicle search.  (Def's Mot. Suppress, Aug. 19, 2020, Docket No. 127.) Magistrate Judge Thorson held an evidentiary hearing on October 16, 2020, which included testimony from Agent Altendorfer, Trooper Ignaszewski, and Trooper Mains. (Minute Entry, Oct. 16, 2020, Docket No. 142.)  Thereafter, Magistrate Judge Thorson requested post-hearing briefs on the motion to suppress.  (*Id*.)  Parties filed their respective pleadings, (*see* Def. Mem. Supp., Dec. 12, 2020, Docket No. 155; Pl. Mem. Opp., Jan. 6, 2021, Docket No. 158), and Magistrate Judge Thorson then issued an R&R recommending that the Court deny Gaston's motion to suppress.  (R&R at 16, Feb. 5, 2021, Docket No. 164.) Gaston filed objections to the R&R.  (Def. Obj. R&R, Feb. 19, 2021, Docket No. 165.)

---

[2] A second superseding indictment returned on March 25, 2021, after the R&R was filed, adding a third charge for corruptly attempting to obstruct an official proceeding in violation of 18 U.S.C. § 1512(c)(2).  For clarity, the Court cites to the most current, operative version of the Indictment.

-9-

**DISCUSSION**

I. **STANDARD OF REVIEW**

After an R&R is filed by a magistrate judge, "a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Crim. P. 59(b)(2). For a dispositive matter such as a motion to suppress evidence, "[t]he district judge must consider de novo any objection to the magistrate judge's recommendation." Fed. R. Crim. P. 59(b)(1), (3); *see also* 28 U.S.C. § 636(b)(1). "The objections should specify the portions of the magistrate judge's [R&R] to which objections are made and provide a basis for those objections." *Mayer v. Walvatne*, No. 07-1958, 2008 WL 4527774, at *2 (D. Minn. Sept. 28, 2008).

II. **ANALYSIS**

A. **Probable Cause Based on the Crime Stoppers Tip**

Gaston first objects to the R&R's conclusion that law enforcement had probable cause to justify the stop and search prior to the vehicle being stopped on June 12, 2019. Gaston argues that the information obtained from the Crime Stoppers tip and corroborated by law enforcement was "general in nature," "partially incorrect," and insufficient to support probable cause. The Court disagrees.

Under the Fourth Amendment, warrantless searches and seizures are per se unreasonable subject to several established and well-delineated exceptions. *Katz v.*

*United States*, 389 U.S. 347, 357 (1967).  The automobile exception permits a warrantless search of a vehicle if police have "probable cause to believe the vehicle contained contraband or other evidence of a crime before the search began." *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003).

Probable cause can be supported by informant information if that information is reliable.  *United States v. Brown*, 49 F.3d 1346, 1349 (8th Cir. 1995).  An informant's information can be considered reliable if the informant has a track record of providing accurate information or if the tip was independently corroborated by law enforcement. *United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013).  When the informant is unknown to law enforcement, as is the case here, police may deem the informant's information credible and sufficient to support probable cause if the information is "at least partly corroborated" or the informant provides accurate predictive information about certain events.  *Id.*  Prediction of innocent behavior increases the probability that other aspects of the informant's prediction, including predictions of criminal activity, are also correct.  *See Illinois v. Gates*, 462 U.S. 213, 244–45 (1983); *Brown*, 49 F.3d at 1349.  Corroboration of predictive elements of the tip are especially valuable in establishing reliability of the informant's tip.  *Brown*, 49 F.3d at 1349–50.

Here, the information in the Crime Stoppers tip was independently corroborated by law enforcement and the tip correctly predicted Gaston's travel across the country. Contrary to Gaston's assertions, the information in the tip was not general but specific

and detailed.[3] The tip provided information on Gaston's and Lindskog's appearances, including Lindskog's chipped front tooth, their birth dates, phone numbers, address, and Gaston's criminal history. All of this detailed and specific information was corroborated by law enforcement with one minor discrepancy—Lindskog's birthdate was off by one year.[4] This minor discrepancy is inconsequential in light of all the other accurate information and does not undermine the reliability of the tip. *See United States v. Amaya*, 52 F.3d 172, 175 (8th Cir. 1995) (holding that slight discrepancies in information provided by informants was inconsequential in light of the totality of the circumstances).

The tip accurately predicted defendant's travel itinerary and his method of travel, stating that he started in Vegas, stopped in Arizona, and was traveling back to Minnesota in a one-way rental vehicle. These predictions were corroborated by law enforcement through Gaston's social media post, rental car records, and GPS tracking information. The fact that the tipster's predictions of innocent behavior were accurate increased the likelihood that their prediction that Gaston was illegally trafficking drugs was also accurate. *See Brown*, 49 F.3d at 1349. Therefore, the tip supported probable cause to

---

[3] Notably, Agent Altendorfer testified that this was "by far . . . the most detailed and extensive tip that [he'd] ever seen." (Hr'g Tr. at 27:17–21.)

[4] Gaston argues that because the phone number was not listed under his name, this is an additional inconsistency undermining the reliability of the tip. However, the phone number was tied to his last name and independently corroborated as accurate when the GPS location of the phone accurately tracked Gaston's movements, as predicted by the tip.

believe that the rental vehicle contained contraband or other evidence of a crime before the vehicle was stopped.

Gaston further argues that the fact that VCET asked the Minnesota State Patrol to conduct a "whisper" stop supports his claim that probable cause was lacking. This contention is unsupported in the record. None of the officers testified that they thought probable cause was lacking. Rather, Agent Altendorfer testified that he wanted the Minnesota State Patrol officers to establish their own probable cause "if possible" and that this type of stop is common when officers wish to keep investigative information from a suspect during an investigation. Agent Altendorfer's testimony indicates that VCET intended to make the stop regardless of whether local law enforcement established independent probable cause. Accordingly, the Court finds that sufficient probable cause existed to stop and search Gaston's rental vehicle prior to the observation of the traffic violation, based solely on the Crime Stoppers tip.

Because the stop and search of the vehicle was permissible under the automobile exception and because the officers had probable cause to stop and search the vehicle without a warrant, the Court will overrule Gaston's objection on this ground.

### B.     Probable Cause Based on the Traffic Violation

Gaston next argues that the traffic stop was not supported by probable cause because the evidence and testimony regarding Lindskog's traffic violation is not credible. A traffic violation, no matter how minor, constitutes probable cause to stop the driver of

the vehicle. *United States v. Linkous*, 285 F.3d. 716, 719 (8th Cir. 2002). This is true even if the stop is a pretext for another investigation. *Id.* Here, Investigator Fritze observed Lindskog make an unlawful lane change that cut off another motorist, constituting probable cause for the search.[5]

Gaston contends that the testimony of Agent Altendorfer and Trooper Ignaszewski regarding Investigator Fritze's radio transmission is not credible. Magistrate Judge Thorson found the testimony to be credible. As with the other aspects of a properly objected to R&R, the Court reviews a magistrate judge's credibility determinations de novo. *See United States v. Lothridge*, 324 F.3d 599, 600–01 (8th Cir. 2003). The Court has independently reviewed the transcript and exhibits introduced at the hearing before Magistrate Judge Thorson. The Court finds that both Agent Altendorfer and Trooper Ignaszewski credibly testified under oath that they received a radio transmission from Investigator Fritze reporting Lindskog's illegal lane change, which cut off another motorist. Gaston has presented no other evidence, outside of his own speculation, that the testimony is not credible. Thus, the Court finds that Trooper Ignaszewski had

---

[5] It does not matter that Trooper Ignaszewski did not observe the traffic violation. "When multiple officers are involved in an investigation, probable cause may be based on their collective knowledge and need not be based solely on the information within the knowledge of the arresting officer as long as there is some degree of communication." *United States v. Robinson*, 664 F.3d 701, 703 (8th Cir. 2011) (quotation omitted).

probable cause to make the traffic stop after Investigator Fritze's radio transmission reporting Lindskog's illegal lane change.

### C. Extension of the Traffic Stop

Gaston also objects to the Magistrate Judge's conclusion that Trooper Ignaszewski had good cause to extend the scope of the traffic stop and permit the K-9 search of the vehicle. An officer making a traffic stop may ask the driver questions regarding their destination and purpose, check their license and registration, or request that the driver step over to the patrol car. *Linkous*, 285 F.3d at 719. A police officer may ask similar questions of the vehicle's occupants. *Id.* However, an officer may extend the scope of the stop only if they have reasonable suspicion that criminal activity is afoot. *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005). A court looks at the totality of the circumstances, in light of the officer's experience, to determine whether the officer had reasonable suspicion to expand the scope of the stop. *Linkous*, 285 F.3d at 720. Factors when considered alone may not give rise to reasonable suspicion, but in combination with other factors may warrant further investigation. *Id.* Conflicting stories between the driver and passenger may provide justification to expand the scope of the stop. *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004).

The combination of suspicious factors Trooper Ignaszewski observed provided reasonable suspicion for him to expand the scope of the stop. In his objections, Gaston analyzed each of these factors standing alone and concluded that Trooper Ignaszewski

lacked reasonable suspicion. However, the Court must look at the totality of the circumstances to determine if the factors, when viewed together, gave rise to reasonable suspicion of criminal activity. *Linkous*, 285 F.3d at 720. During his preliminary questioning, Trooper Ignaszewski's suspicion of criminal activity began to grow. He confirmed that Lindskog's license was suspended. He noted that the one-way rental vehicle had cost $1600, which he knew to be significantly more expensive than a flight from Las Vegas to Minneapolis. Gaston and Lindskog provided conflicting details of their travels, with Gaston stating they were in a hurry to get home and Lindskog stating they were not, even though, according to Gaston, they were heading to Lindskog's birthday event. In addition, Trooper Ignaszewski smelled a strong odor of air freshener, which he testified he had encountered in previous drug interdictions. He also noted that Gaston and Lindskog were both nervous during questioning, more so than the general motoring public.[6] Further, Trooper Ignaszewski had probable cause based upon the investigative team's collective knowledge of information initially provided in the detailed Crime Stoppers tip, corroborated by the VCET team, and communicated between Ignaszewski, Altendorfer, and other VCET team members. *See United States v. Robinson*, 664 F.3d 701, 703 (8th Cir. 2011) ("When multiple officers are involved in an investigation, probable

---

[6] Nervousness alone is not sufficient to give rise to reasonable suspicion. *See United States v. Beck*, 140 F.3d 1129, 1139 (8th Cir. 1998). Here, however, nervousness is just one among multiple suspicious factors.

cause may be based on their collective knowledge . . . as long as there is some degree of communication." (quotation omitted)).  Considering the totality of the circumstances, in light of Trooper Ignaszewski's experience, he had reasonable suspicion to extend the scope of the stop and did not violate Gaston's Fourth Amendment rights by doing so.

### D.     K-9 Search of the Vehicle

Gaston next objects to the Magistrate Judge's conclusion that the K-9 search was permissible and argues that the K-9 search was unlawful because Trooper Ignaszewski opened the car door and led his K-9 into the vehicle.  As a preliminary matter, Trooper Ignaszewski's search of the vehicle interior was lawful because Gaston, the person who had rented the vehicle, voluntarily consented to a search.  An officer may search a vehicle without a warrant or probable cause if the officer "reasonably believes that he has received consent to search" the vehicle.  *United States v. Coney*, 456 F.3d 850, 860 (8th Cir. 2006).  The Court looks at the totality of the circumstances in determining whether the consent was voluntary.  *Id.*

Gaston has presented no evidence that the consent was not voluntary, or that Trooper Ignaszewski had any reason to believe the consent was not voluntary.  Rather, Gaston argues that he felt he had no other choice but to consent.  Regardless of what Gaston believed internally, the Court only considers whether it was objectively reasonable for Trooper Ignaszewski to believe that Gaston had consented to the search.  Trooper Ignaszewski twice asked if he could search the car, and Gaston replied, "Yes, you

can." Based on this unequivocal statement, it was objectively reasonable for Trooper Ignaszewski to believe that Gaston voluntarily consented to the search. There is no evidence to suggest that Trooper Ignaszewski coerced Gaston into giving his consent. Because Gaston voluntarily consented to the search, the search was constitutional and did not violate the Fourth Amendment.

Further, the K-9 search was lawful because Trooper Ignaszewski had probable cause to search the vehicle prior to opening the door. *See United States v. Pulido-Ayala*, 892 F.3d 315, 319 (8th Cir. 2018) (finding that "it is uncontroversial that if police had probable cause to search the car *before* the dog entered the interior, then any search effected by the entry was permissible.") A dog sniff resulting in an alert to a car, or other item, alone provides an officer with probable cause to believe drugs are present. *United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007); *United States v. Carrazco*, 91 F.3d 65, 67 (8th Cir. 1996) (finding that a drug dog's clear alert to the exterior of a vehicle provided officers with probable cause to search the interior of the vehicle for drugs). Trooper Ignaszewski testified that his K-9 Jery alerted to the presence of narcotics several times while sniffing the exterior of the vehicle. K-9 Jery's alerts provided sufficient independent probable cause for Trooper Ignaszewski to open the door to the vehicle so K-9 Jery could locate the source of the odor. Trooper Ignaszewski's actions were constitutional and present no violation of Gaston's Fourth Amendment rights.

**CONCLUSION**

In sum, the Court finds that the officers had probable cause to stop and search Gaston's vehicle under the automobile exception, based on the Crime Stopper's tip as well as the reasonable suspicion that Trooper Ignaszewski generated through his observations and information provided by Gaston and Lindskog.  Gaston's voluntary consent along with the probable cause generated by K-9 Jery's multiple alerts to the exterior of the vehicle demonstrate that Trooper Ignaszewski's extension of the traffic stop and search of the vehicle's interior were permissible under the Fourth Amendment. Accordingly, the Court will overrule Gaston's objections, adopt the R&R, and deny the Motion to Suppress.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Gaston's Objection to the Report and Recommendation [Docket No. 165] is **OVERRULED.**

2. The Magistrate Judge's Report and Recommendation [Docket No. 164] is **ADOPTED.**

3. Gaston's Motion to Suppress [Docket No. 127] is **DENIED.**

DATED: April 5, 2021
at Minneapolis, Minnesota.

                                                                                                                JOHN R. TUNHEIM
                                                                                                                     Chief Judge
                                                                                  United States District Court